**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

SONYA A. LEHTINEN,

                                 **Plaintiff,**

      vs.                                        **1:12-cv-393**
                                              **(MAD/CFH)**

TOWN OF GREENPORT,


                                 **Defendant.**
_____

**APPEARANCES:**                       **OF COUNSEL:**

**LOMBARDI, WALSH, DAVENPORT**     **PAUL E. DAVENPORT, ESQ.**
**AND AMODEO, PC**
187 Wolf Road, Suite 211
Albany, New York 12205
Attorneys for Plaintiff

**GOLDBERG SEGALLA, LLP**         **JONATHAN M. BERNSTEIN, ESQ.**
8 Southwoods Boulevard
Suite 300
Albany, New York 12211
Attorneys for Defendant


**Mae A. D'Agostino, U.S. District Judge:**

### MEMORANDUM-DECISION AND ORDER

### I. INTRODUCTION

      Plaintiff commenced this employment discrimination action on March 2, 2012, alleging

causes of action for interference and retaliation under the Family and Medical Leave Act of 1993,

29 U.S.C. § 2617 ("FMLA"), and for age and disability discrimination under the New York State

Human Rights Law, N.Y. Exec. Law § 296 ("NYSHRL"). *See* Dkt. No. 1. Presently before the

Court is Defendant's motion for summary judgment. *See* Dkt. No. 27. For the reasons stated

herein, the Court grants Defendant's motion for summary judgment as to Plaintiff's FMLA claims,

and declines to exercise supplemental jurisdiction over Plaintiff's NYSHRL claims.

## II. BACKGROUND[1]

Plaintiff Sonya Lehtinen was employed by Defendant Town of Greenport ("Town") beginning in January 1997 as a part-time court clerk for the Town of Greenport Justice Court, and was later hired full time in that capacity. Dkt. No. 30, Plaintiff's Supplemental Response to Statement of Material Facts ("Plf's SOMF") ¶¶ 3-4. As a court clerk, Plaintiff was responsible for, among other things, entering data into a New York State computer system for traffic tickets in default for non-payment, known as TSLED. *Id.* ¶ 14. Plaintiff was also responsible for keeping up with error reports from the New York State Department of Motor Vehicles ("DMV") and Division of Criminal Justice Services ("DCJS") by making corrections on TSLED. *Id.* ¶ 15. Plaintiff's responsibilities further included processing payments made by members of the public, and interacting with members of the public when they came to the clerk's office at the town hall. *Id.* ¶¶ 16-17.

On November 25, 2010, Plaintiff took leave from her employment with the Town to have knee replacement surgery. *Id.* ¶ 5. Plaintiff testified that she discussed her medical leave with Judge Robert Brenzel, her supervisor, and after she provided a letter from her doctor, her leave request was approved. Dkt. No. 27-4 ("Lehtinen 50-h")[2] at 54-55. Prior to taking leave, Plaintiff recommended Cindy Tracey to cover her position as court clerk while she was out on leave. Plf's SOMF ¶ 6. While still out on leave, Plaintiff was terminated from her employment with the

---

[1] The following facts are undisputed, or indisputable, unless otherwise noted.

[2] Prior to the commencement of the instant action, Plaintiff was examined by counsel for the Town pursuant to N.Y. Gen. Mun. Law § 50-h.

Town on February 21 or 22, 2011, at which time she was 60 years old.[3] *Id.* ¶¶ 12; Lehtinen 50-h at 8[4]. Judge Brenzel was one of the Town representatives who made the decision to terminate Plaintiff. Dkt. No. 34-1, Defendant's Response to Plaintiff's Supplemental Statement of Material Facts, ("Def's Resp. SOMF") ¶ 2. Thereafter, Cindy Tracey was hired to fill the position on a permanent basis on March 2, 2011. Dkt. No. 27-10 ¶ 2. As of November 2013, Ms. Tracey was 57 years old. *Id.* Plaintiff was paid her full salary by the Town from November 21, 2010, through January 29, 2011. Plf's SOMF ¶ 10. At the time of her termination, Plaintiff had exhausted all of her personal, sick, and vacation time. *Id.* ¶ 13.

Defendant contends that Plaintiff's termination was a result of her deficient performance and unprofessional conduct. As Judge Brenzel testified, "[t]he reasons for [Plaintiff's termination] was her performance over a period of time all came to a head when things were discovered by the new court clerk, that weren't being done, and should have been done and things like that." Dkt. No. 27-8 ("Brenzel Dep., Pt. 2") at 27.

Prior to September 2010, Judge Brenzel observed that tickets were not being processed in a timely manner, and that he would see them "in boxes on the floor, on the counter, just all over the court clerk's office, obviously not being taken care of." Brenzel Dep., Pt. 2 at 17. Judge Brenzel testified that he "talked to [Plaintiff] many times about cleaning up this mess on the floor and getting things where they should to be [sic]. And, it wasn't done." *Id.* On the occasions

---

[3] Plaintiff claims that she was terminated on February 21, 2011. Defendant maintains that she was terminated on February 22, 2011. Plaintiff's termination letter is dated February 22, 2011, and states: "Following our meeting this afternoon, please be advised that your employment as the Town of Greenport Justice Court Clerk has been terminated as of this date." Dkt. No. 27-26. The Court need not resolve this dispute, because whether Plaintiff was terminated on the 21st or 22nd of February is immaterial to the Court's disposition of the pending motion.

[4] To avoid confusion, anytime the Court references a specific page number for an entry on the docket, it will cite to the page number assigned by the Court's electronic filing system.

when Judge Brenzel spoke with Plaintiff about this issue, "[h]er response was it was too much for her to handle by herself." *Id.* at 18.

Defendant submitted an affidavit from Dawn Banks, who worked part time for the Town in 2010 and 2011 assisting with its records retention system. Dkt. No. 27-17. Ms. Banks claims that at an unspecified time while she worked in the clerk's office, she noticed a large volume of tickets that had not been entered into the computer system. *Id.* ¶ 3. On one occasion, Plaintiff asked Ms. Banks to enter tickets that were located "in a plastic bag hidden behind a soda box under the front counter in the Clerk's office." *Id.* ¶ 4. Plaintiff told Ms. Banks that if she was unable to finish processing those tickets, she should place them back in the plastic bag and behind the soda box under the counter, "so that Judge Brenzel would not notice that [Plaintiff] was behind in processing the tickets." *Id.* ¶ 5. Ms. Banks approached Judge Brenzel while Plaintiff was out on leave and recounted this incident to him. *Id.* ¶ 6. Plaintiff disputes that this incident ever occurred. Dkt. No. 27-5 ("Lehtinen Dep., Pt. 1") at 55. Judge Brenzel also testified that Ms. Banks relayed this incident to him while Plaintiff was out on leave, and that he had previously personally observed a "large amount of crumpled up tickets stuffed in the back, hidden." Brenzel Dep., Pt. 2 at 31. It is undisputed that prior to Plaintiff's FMLA leave, Judge Brenzel was aware Plaintiff's work was backed up. Def's Resp. SOMF ¶ 10.

Defendant also contends that Judge Brenzel spoke with Plaintiff about certain conduct he disapproved of during the course of her employment. For instance, Defendant notes that Plaintiff had difficulty in getting along with an assistant district attorney, Tracy Lindauer, which Judge Brenzel discussed with her. *See* Brenzel Dep., Pt. 2 at 4 ("[T]he district attorney complained that there was a bad relationship between Sonya and the assistant district attorney assigned to the court; the DA would ask for things to be done or ask for information and wouldn't get them. And

then they would call me and I supplied it. And I told Sonya many times that she's got to cooperate with these other agencies, and to do that. But it didn't let up."); *cf.* Lehtinen Dep., Pt. 1 at 33 ("There were times we didn't agree [about h]ow much time I could spend with [ADA Lindauer] on the phone giving information that she should have written down in court."). It is undisputed that Judge Brenzel was aware of this issue prior to Plaintiff's FMLA leave. Def's Resp. SOMF ¶ 14. Defendant further notes that Judge Brenzel informed Plaintiff that it was the duty of the court officer, not her, to instruct individuals appearing in court to remove their hats. *See* Brenzel Dep., Pt. 2 at 55 ("Sonya, from time to time would apparently consider herself something other than the court clerk. She would reprimand people to take your [sic] hat off, stop your noise. Sometimes she would get up from her desk and go back where the public was sitting and tell them to be quiet. . . . [W]e had a court officer in uniform to do that, and that was that court officer's job to do it; it was not the court clerk's job to do."); Lindauer 50-h at 44-45, 47. Defendant also cites a number of incidences in which Plaintiff acted unprofessionally in dealing with the public. For example, in 2006, she referred to two individuals who had come to the Town Hall to have a document notarized as "rubbish" or "trash," Dkt. No. 27-12 at 15, and was later told that this behavior was unacceptable, Dkt No. 27-7 ("Brenzel Dep., Pt. 1") at 47.

Defendant further notes that Plaintiff admitted there was a backlog of forms requiring correction based upon DMV and DCJS error reports issued to the Town, Lehtinen Dep, Pt. 2 at 10-13, and a backlog of scofflaw reports[5] to DMV for unpaid fines, *id.* at 14. Plaintiff also testified that she had trouble keeping up with the mail, due to the volume, *id.* at 16-17, and that there were instances in which individuals had paid fines, but she had failed to enter that payment,

---

[5] A "scofflaw report" is a report prepared by the court clerk summarizing all tickets issued where the offender either fails to respond within 60 or 90 days. *See* Tracey Aff. ¶ 4 (60 days); Lehtinen Dep. Pt. 2 at 66 (90 days).

resulting in an unwarranted suspension of those individuals' driver's licenses, *id.* at 17-18.

According to Plaintiff's replacement, Cindy Tracey, when she assumed the position of court clerk while Plaintiff was on leave, "it became immediately apparent that the Clerk's office was being mismanaged by plaintiff. . . . Upon my arrival to the Town of Greenport Clerk's office, I noticed a large volume of tickets that were located in the office that had not been attended to." Dkt. No. 27-10 at ¶ 3. In addition, Ms. Tracey submitted reports generated by the Town's computer systems which

> show the massive backlog caused by plaintiff's failure to properly keep up by entering data regarding traffic tickets that were in default. . . . Plaintiff failed to enter the tickets that were in default. Instead, she left them in boxes on the floor of the Town Court Office. Many tickets sat for prolonged periods of time without being entered so the violator did not pay[,] depriving money to government coffers and letting the violator not face any consequences.
>
> On January 12, 2011, I entered 324 of these suspended tickets in the DMV computer system, most of which Plaintiff failed to enter in the first place. . . .
>
> Plaintiff failed to keep up with error reports from the DMV and DCJS. . . .
>
> Plaintiff also failed to keep up with the error reports for Criminal Disposition Reports. . . . There was also a backlog of responding to these error reports that I had to attend to when I was filling in for plaintiff.
>
> In 2011, I found two checks that had not been cashed in plaintiff's desk drawer each for $25 made out to the Town of Greenport. One check was from 2001 and the other from 2004. . . .
>
> I reported all of the above to Judge Brenzel prior to plaintiff's termination from employment with the Town of Greenport on February 22, 2012 [sic], to make him aware of the terrible state that the Clerk's office was in when I first entered the position.

*Id.* ¶¶ 4-10.

As further evidence of Plaintiff's deficient performance, Defendant refers to an audit conducted in February 2011 that revealed an excess of approximately $5,800 in the Town's account, which should have been processed, credited to compliant defendants, and forwarded to the New York State Comptroller's office:

> Following an audit, that much excess money was found in the account. It obviously was money that should have been entered in to a number of defendants who paid it, and, it wasn't. It was deposited in the bank and sat there. And it should have been on the monthly report, whatever these amounts that were paid to the town so that it would have been sent to the comptroller over a period of time that all that was collected. It wasn't entered properly and that's why it just sat in the bank account.

Brenzel Dep., Pt. 2 at 52-53. When Judge Brenzel raised this issue with Plaintiff during the termination meeting, she responded: "I believe you are aware that there was a problem with the computer where you would enter payments and, if you went back to check it, it wasn't there." Lehtinen 50-h at 29; *see also* Dkt. No. 27-6 ("Lehtinen Dep., Pt. 2") at 6 ("Well Bob, don't you remember you put something in the computer and when you went back to double-check it, it would be gone, we had an ongoing problem? And he said: Yes."). Plaintiff further testified that despite this issue having previously occurred (*i.e.*, entries failing to record in the computer system), she had never seen an adjustment or report to the Comptroller for unidentified funds prior to the February 2011 incident. *See* Lehtinen Dep., Pt. 2 at 6-8.

Following Plaintiff's termination, her replacement Cindy Tracey was initially hired on a full-time basis. At some point thereafter, according to Judge Brenzel, Ms. Tracey's schedule was reduced to three and a half days a week because

> when Cindy [Tracey] came in, immediately we saw big differences in the way the office was run. Everything was caught up and the way it was supposed to be, and she did it in the fraction of the time it was done before. . . . She accomplished what has to be done in three and a half days a week.

Brenzel Dep., Pt. 2 at 24-25.

Plaintiff contends that during the meeting in which she was terminated, Judge Brenzel complained that she was too slow in entering data and was getting backed up. Lehtinen 50-h at 35-36. According to Plaintiff, she understood Judge Brenzel's complaints to be based upon her age, because her inability to keep up with the volume "wasn't an issue before" she was dismissed. *Id.* at 36. Between the time she began employment with the Town in 1997 and the time she was terminated, Plaintiff estimated that the volume of tickets tripled. *Id.* at 37. As a result, she could not keep up and requested additional help from Judge Brenzel. *Id.* Plaintiff believed the problem that made it a "struggle to keep up" was the condition with her knee that required surgery. *Id.* at 38 ("I think I was perceived as slowing down and being old. [Judge Brenzel commented:] 'If this job is getting too big for you, we will finds [sic] someone who can do it.'"). Plaintiff claims that Judge Brenzel nicknamed her "Chester," a character with a "stiff leg" from the television show "Gun Smoke," which she understood to be a reference to her being "[o]ld and handicapped, limping." Lehtinen 50-h at 58. Plaintiff could not recall any specific comments made by any representatives of the Town indicating that the reason for her termination was her FMLA leave. Lehtinen 50-h at 35; Lehtinen Dep., Pt. 2 at 4.

According to Plaintiff, Judge Brenzel knew about the backlog due to increased ticket volume and each of the other reasons the Town cited for her dismissal prior to her leaving for FMLA leave. Def's Resp. SOMF ¶¶ 5, 10, 12-14. As to his awareness of the substantial workload, Plaintiff notes that on September 20, 2010, Judge Brenzel sent a memorandum to the Town Supervisor and Town Board Members requesting additional assistance:

> I have been made to understand that there is a possibility that the Town Police Department may, in the near future, seek to have a part time clerk hired who might work two or three days a week.

Dawn Banks currently holds that part time position but could not be considered as the new clerk because of her current full time employment with the county.

In addition to her current duties with the police, Dawn has from time to time, assisted the court by working 2 or 3 hours on some weekends. During that time she has helped "catch up" with the myriad computer entries necessary to process the Vehicle & Traffic tickets in order that they then may be dealt with, either by sending fine notices to those who plead guilty by mail, or otherwise having trial dates scheduled.

Dawn has also been trained in our Grant funded document management system and has been helpful in scanning some disposed criminal cases into the computer thereby making room for the ever increasing paperwork coming into the court.

In her present position with the Police Department, Dawn is paid $11.08 per hour, with no benefits.

I am respectfully requesting that the Board consider allowing Dawn to continue her part time employment now as an assistant to the Justice Court. If she were allowed to come in on some, not all, weekends and occasionally during the week after normal business hours, with the total time in any one week not to exceed 8 hours, I feel that the Town would see an immediate increase in the funds turned over to it at the end of each month, simply because it would be possible to process more traffic tickets. The sooner a ticket is processed and a fine notice is sent, the sooner the money would be available to the town.

It would appear that the current Court budget would be more than enough to cover whatever funds that were needed to pay Dawn.

One other thing that needs to be addressed is what might happen in the event that our court clerk should ever face a problem that might keep her from coming to work. Now that may be a distinct possibility because she has recently been having problems with a knee and replacement has been mentioned by one doctor. In that event she would probably be out for some time. That would leave me as the only other person familiar with the duties of the clerk. All of the other busy courts in this county have at least two clerks. Greenport is, according to the District Attorney, the busiest town in criminal matters. I think you can imagine the possible dilemma.

Dkt. No. 29-5.

On April 18, 2011, counsel for the Town sent Plaintiff a letter retroactively approving FMLA leave for the period of November 25, 2010, through February 18, 2011. Dkt. No. 27-15 at 40. Along with that letter, the Town provided a Notice of Eligibility and Rights & Responsibilities, which stated that Plaintiff had "a right under the FMLA for up to 12 weeks of unpaid leave in a 12-month period calculated as the calendar year (January - December)." *Id.* at 41. Thereafter, Plaintiff timely filed a written notice of claim, pursuant to New York State Municipal Law § 50-e, based upon the discriminatory acts alleged in the instant action, which claim remains unpaid. Dkt. No. 1 ¶ 6, Exh. A.

### III. DISCUSSION

**A.    Summary Judgment Standard**

A court may grant a motion for summary judgment only if it "determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the moving party as a matter of law." *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 36 (2d Cir. 1994) (citations omitted). When analyzing a summary judgment motion, the court "'cannot try issues of fact; it can only determine whether there are issues to be tried.'" *Id.* at 36-37 (citation omitted). Moreover, it is well-settled that a party opposing a motion for summary judgment may not simply rely on the assertions in its pleading. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (citing Fed. R. Civ. P. 56(c), (e)).

In assessing the record to determine whether any such issues of material fact exist, the court is required to resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. *See Chambers*, 43 F.3d at 36 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)) (other citations omitted). Where the non-movant either does not respond to the motion or fails to dispute the movant's statement of material facts, the court may not rely solely

on the moving party's Rule 56.1 statement; rather, the court must be satisfied that the citations to evidence in the record support the movant's assertions. *See Giannullo v. City of New York*, 322 F.3d 139, 143 n.5 (2d Cir. 2003) (holding that not verifying in the record the assertions in the motion for summary judgment "would derogate the truth-finding functions of the judicial process by substituting convenience for facts").

**B.     Summary Judgment Standards for Employment Discrimination Cases**

Courts are cautious in granting summary judgment in employment discrimination cases where the employer's intent is at issue, *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008), "because direct evidence of an employer's discriminatory intent is rare and 'must often be inferred from circumstantial evidence,'" *Serby v. New York City Dep't of Educ.*, No. 09-CV-2727, 2012 WL 928194, *5 (E.D.N.Y. Mar. 19, 2012) (quoting *Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 603 (2d Cir. 2006)).  However, "'[s]ummary judgment is appropriate even in discrimination cases, for . . . the salutary purposes of summary judgment – avoiding protracted, expensive and harassing trials – apply no less to discrimination cases than to other areas of litigation.'" *Hongyan Lu v. Chase Inv. Servs. Corp.*, 412 Fed. Appx. 413, 415 (2d Cir. 2011) (quoting *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000), superseded by statute on other grounds as stated in *Ochei v. Coler/Goldwater Mem'l Hosp.*, 450 F. Supp. 2d 275, 282 (S.D.N.Y. 2006)).  Indeed, "'[i]t is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases.'" *Feingold v. New York*, 366 F.3d 138, 149 (2d Cir. 2004) (quoting *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001)).  Furthermore, "[e]ven in the discrimination context . . . a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment." *Holcomb*, 521 F.3d at 137 (citing *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985)).  A "nonmoving party 'must offer some

hard evidence showing that its version of the events is not wholly fanciful.'" *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) (quoting *D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir. 1998)). "If the evidence [presented by the non-moving party] is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986) (citations omitted). The Second Circuit has held that:

> In discrimination cases, the inquiry into whether the plaintiff's sex (or race, etc.) caused the conduct at issue often requires an assessment of individuals' motivations and state of mind, matters that call for a sparing use of the summary judgment device because of juries' special advantages over judges in this area. Nonetheless, an employment discrimination plaintiff faced with a properly supported summary judgment motion must do more than simply show that there is some metaphysical doubt as to the material facts. She must come forth with evidence sufficient to allow a reasonable jury to find in her favor.

*Brown v. Henderson*, 257 F.3d 246, 251-52 (2d Cir. 2001) (citations and quotations omitted).

"[S]ummary judgment may not be granted simply because the court believes that the plaintiff will be unable to meet his or her burden of persuasion at trial. There must either be a lack of evidence in support of the plaintiff's position, or the evidence must be so overwhelmingly tilted in one direction that any contrary finding would constitute clear error." *Danzer v. Norden Sys. Inc.*, 151 F.3d 50, 54 (2d Cir. 1998) (citations omitted). "Nonetheless, when an employer provides convincing evidence to explain its conduct and the plaintiff's argument consists of purely conclusory allegations of discrimination, the Court may conclude that no material issue of fact exists and it may grant summary judgment to the employer." *Walder v. White Plains Bd. of Educ.*, 738 F. Supp. 2d 483, 493 (S.D.N.Y. 2010) (citation omitted); *see also Stern v. Trs. of Columbia Univ.*, 131 F.3d 305, 312 (2d Cir. 1997) (same); *Meloff v. N.Y. Life Ins. Co.*, 51 F.3d 372, 375 (2d Cir. 1995) (same).

**C.      Analysis**

### 1. FMLA Claims

The FMLA gives eligible employees an "entitlement" to twelve workweeks per year of unpaid leave "[b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). While an employee is on FMLA leave it is "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided" by the FMLA. 29 U.S.C. § 2615(a)(1). At the end of a FMLA leave, the employee has the right to be restored to the position, or its equivalent, that he or she held prior to taking leave. 29 U.S.C. § 2614(a)(1)(A). However, this right is not absolute. "An employee has no greater right to reinstatement or to other benefits and conditions of employment than if the employee had been continuously employed during the FMLA leave period." 29 C.F.R. § 825.216(a). Moreover, "[i]f the employee is unable to perform an essential function of the position because of a physical or mental condition, including the continuation of a serious health condition . . . the employee has no right to restoration to another position under FMLA." 29 C.F.R. § 825.216(c); *see also Sarno v. Douglas Elliman-Gibbons & Ives, Inc.*, 183 F.3d 155, 161-62 (2d Cir. 1999) ("The fact that Sarno was not restored to his position at the end of that 12-week period did not infringe his FMLA rights because it is also undisputed that at the end of that period he remained unable to perform the essential functions of his . . . position.").

The FMLA expressly creates a private cause of action for equitable relief and money damages against any employer who violates Section 2615. *See* 29 U.S.C. § 2617(a)(2); *Nevada Dep't of Human Res. v. Hibbs*, 538 U.S. 721, 724-25 (2003). The Second Circuit recognizes two claims under the FMLA: (i) interference with FMLA rights; and (ii) retaliation for exercising FMLA rights. *See Potenza v. City of New York*, 365 F.3d 165, 167-68 (2d Cir. 2004); *accord Voltaire v. Homes Servs. Sys., Inc.*, 823 F. Supp. 2d 77, 90 (E.D.N.Y. 2011) ("The Second Circuit

recognizes a distinction between claims which allege a violation of § 2615(a)(1) – so called 'interference' claims – and claims which allege violations of § 2615(a)(2) and (b), which are called 'retaliation' claims."); *Di Giovanna v. Beth Israel Med. Ctr.*, 651 F. Supp. 2d 193, 198-99 & n.30 (S.D.N.Y. 2009) (citing cases). In this action, Plaintiff asserts both such claims.

### a. Interference

Plaintiff alleges that Defendant interfered with her FMLA rights by failing to return her to "a comparable position upon her return from her convalesce [sic]," and failing to afford her "the full allotment of unpaid leave as required" under the FMLA. Dkt. No. 1 ¶ 31. Defendant asserts that Plaintiff cannot maintain an interference claim because she was terminated for just cause and has adduced no evidence suggesting that her FMLA leave was a consideration in her termination. Dkt. No. 27-33 at 19. Defendant also asserts, with regard to the 'full allotment of leave' claim, that Plaintiff did not provide proper notice to the Town regarding her FMLA leave and, in any event, that Plaintiff was not damaged because she had exhausted all of her paid leave (*i.e.*, personal, sick, and vacation time) at the time of her termination. *Id.* at 19-22.

Although the Second Circuit has discussed interference claims, it has not yet articulated or identified the standard for resolving such claims. *See Potenza*, 365 F.3d at 168 (recognizing interference claims, but declining to articulate the appropriate standard for such claims as the claim at issue was one of retaliation, rather than interference); *see also Sista v. CDC Ixis North Am., Inc.*, 445 F.3d 161, 175-77 (2d Cir. 2006) (affirming summary judgment in favor of the defendant-employer as dismissal of the plaintiff-employee's claim was appropriate, "[r]egardless of whether [plaintiff] asserts an 'interference' or a 'retaliation' claim"). Nonetheless, the majority of district judges in this Circuit have coalesced around the same standard for evaluating interference claims. *See Wanamaker v. Westport Bd. of Ed.*, 899 F. Supp. 2d 193, 205 (D. Conn.

2012) (collecting cases).  To establish a prima facie claim of interference with rights under the

FMLA, a plaintiff must establish by a preponderance of the evidence that:

> (1) she is an eligible employee under the FMLA; (2) defendants
> constitute an employer under the FMLA; (3) she was entitled to
> leave under the FMLA; (4) that she gave notice to defendants of her
> intention to take leave; and (5) defendants denied her benefits to
> which she was entitled by the FMLA.

*Esser v. Rainbow Adver. Sales Corp.*, 448 F. Supp. 2d 574, 580 (S.D.N.Y. 2008) (collecting

cases).[6]  The Second Circuit has indicated that, in order to prove an interference claim, a plaintiff

must show that the defendant "considered [the plaintiff's] FMLA leave . . . a negative factor in its

decision to terminate him."  *Sista*, 445 F.3d at 176; *see also Pearson v. Unification Theological

Seminary*, 785 F. Supp. 2d 141, 162 (S.D.N.Y. 2011).  "[I]t is well-settled that an employer is not

liable for 'interfering' with an employee's leave when the employee would have been terminated

regardless of the leave."  *Pearson*, 785 F. Supp. 2d at 162; *see Sista*, 445 F.3d at 176 (noting that

"the FMLA gives no greater job security than that to which the employee would have been

entitled prior to taking leave") (quoting *Hale v. Mann*, 219 F.3d 61, 66 (2d Cir. 2000)).

Defendant primarily argues that Plaintiff would have been terminated whether or not she

took FMLA leave.  Thus, in order to prevail on this claim, Plaintiff must establish that she was

denied benefits to which she was entitled.  As noted above, "the FMLA does not require an

employer to reinstate an employee who would have lost his position even if he had not taken

FMLA leave."  *Sista*, 445 F.3d at 175 (quotation marks omitted); 29 C.F.R. § 825.216(a) ("An

employee has no greater right to reinstatement . . . than if the employee had been continuously

---

[6]  Although district courts in this Circuit have referred to elements of a prima facie case of
interference under the FMLA, the Second Circuit has yet to determine that such claims are
subject to the *McDonnell Douglas* analysis and in fact has hinted that they are not.  *See Sista*, 445
F.3d at 175-76; *Potenza*, 365 F.3d at 167-68.

employed during the FMLA leave period. An employer must be able to show that an employee would not otherwise have been employed at the time reinstatement is requested in order to deny restoration to employment."); *see also Throneberry v. McGehee Desha Cnty. Hosp.*, 403 F.3d 972, 979 (8th Cir. 2005) ("As long as an employer can show a lawful reason, *i.e.*, a reason unrelated to an employee's exercise of FMLA rights, for not restoring an employee on FMLA leave to her position, the employer will be justified to interfere with an employee's FMLA leave rights."); *Geromanos v. Columbia Univ.*, 322 F. Supp. 2d 420, 429 (S.D.N.Y. 2004) ("FMLA is not a shield to protect employees form legitimate disciplinary action by their employers if their performance is lacking in some manner unrelated to their FMLA leave.") (citation omitted).

As noted above, Defendant raises other potential issues with Plaintiff's claim that she was entitled to FMLA leave.[7] These issues are irrelevant, however, because Plaintiff "cannot show that the [Town] considered [her] FMLA leave and request to return a negative factor in its

---

[7] While the Court makes no finding as to whether these arguments, standing alone, would merit dismissal of Plaintiff's interference claims, the Court notes that both arguments have superficial weaknesses. Defendant first attempts to argue that Plaintiff failed to properly document her request for FMLA leave, and thus, failed to provide adequate notice of her intention to take leave. *See* Dkt. No. 27-33 at 19-20. The validity of this argument is undermined by the fact that on April 18, 2011, the Town retroactively approved Plaintiff's FMLA leave. *See* Dkt. No. 27-15 at 40.

Defendant also argues that it did not interfere with Plaintiff's FMLA leave because Plaintiff had exhausted all of her paid leave time by the time she was terminated, and thus, Plaintiff sustained no damages. *See* Dkt. No. 27-33 at 20-22. Plaintiff responds, and Defendant does not dispute, that the Town's policy is to allow for 12 weeks of FMLA leave per calendar year, and that she was terminated seven weeks into 2011. Although it does not appear that either party has addressed the issue, 29 U.S.C.A. § 2614(c)(1) provides that "during any period that an eligible employee takes [FMLA leave], the employer shall maintain coverage under any 'group health plan . . . for the duration of such leave at the level and under the conditions coverage would have been provided if the employee had continued in employment continuously for the duration of such leave." As such, were Plaintiff able to show that the Town considered her FMLA leave a negative factor in its decision to terminate, Plaintiff could be entitled to an additional five weeks of FMLA leave and any coincident health benefits.

decision to terminate." *Sista*, 445 F.3d at 176. Just as the plaintiff in *Sista*, Plaintiff here cannot "establish that [she] was discharged for taking the leave or that it was a 'negative factor' in [the Town's] decision to fire" her. *Sista v. CDC Ixis N. Am., Inc.*, No. 02 Civ. 3470, 2005 WL 356973, *7 (S.D.N.Y. Feb. 15, 2005) (district court decision in *Sista); see also Bowman v. CSX Transp., Inc.*, --- F.Supp.2d ---, No. 1:12-cv-306, 2014 WL 2195857, *7 (N.D.N.Y. May 22, 2014) (granting the defendant's motion for summary judgment on the plaintiff's claim that his FMLA rights were interfered with when the defendant terminated him with two weeks of FMLA leave remaining).

Not only does it appear clear that Plaintiff was terminated for her deficient performance, but there is not a scintilla of evidence for concluding that her "leave" played any role in this employment decision. *See Museau v. Heart Share Human Svcs. of N.Y.*, No. 12-CV-1851, 2014 WL 1277006, *7 (E.D.N.Y. Mar. 27, 2014) ("Plaintiff has not presented any evidence that Defendants failed to reinstate her because of her FMLA leave. Under these undisputed circumstances, Plaintiff's reinstatement claim must be dismissed."). Indeed, as discussed more fully below, the evidence shows that Plaintiff was terminated for her poor performance, the extent of which appears to have been fully realized during Plaintiff's FMLA leave. Accordingly, Plaintiff's interference claim against must be dismissed.

### b. Retaliation

Plaintiff alleges that Defendant discharged her as a result of her exercise of her FMLA rights, and occurred under circumstances giving rise to an inference of retaliatory intent. Dkt. No. 1 ¶¶ 31, 37. Defendant appears to argue that Plaintiff cannot establish a prima facie case of retaliation, and maintains that, even if she can, the Town had legitimate, nonretaliatiory reasons for terminating her, which Plaintiff cannot prove were pretextual. Dkt. No. 27-33 at 11-17.

To evaluate a retaliation claim arising under the FMLA, courts use the burden-shifting analysis announced in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Potenza*, 365 F.3d at 168. To establish a prima facie case of retaliation, a plaintiff must demonstrate that: (1) she exercised rights protected under the FMLA; (2) she was qualified for her position; (3) she suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent. *See id.* The initial burden of establishing a prima facie case under *McDonnell Douglas* is "minimal." *Schnabel v. Abramson*, 232 F.3d 83, 87 (2d Cir. 2000). If the plaintiff establishes a prima facie case, the burden then shifts to the defendants to articulate "some legitimate, non-discriminatory reason" for their action. *McDonell Douglas*, 411 U.S. at 802. "The employer's burden is merely one of production, not persuasion." *Esser*, 448 F. Supp. 2d at 581 (quotation marks and citation omitted). If the defendant meets its burden of production, "the presumption of discrimination drops out" and the burden then shifts back to the plaintiff "to establish by a preponderance of the evidence that the employer's stated reason was merely a pretext for discrimination." *Id.* (citation omitted); *see also Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

Turning to the instant action, the Court will assume, for purposes of this motion, that Plaintiff can meet the low threshold necessary to establish a prima facie case of retaliation. The Second Circuit has held that a retaliation plaintiff can establish a causal nexus by showing that "the protected activity was followed closely by discriminatory treatment, . . . or through other evidence such as disparate treatment of fellow employees who engaged in similar conduct, . . . or directly through evidence of retaliatory animus directed against a plaintiff by the defendant." *DeCintio v. Westchester Cnty. Med. Ctr.*, 821 F.2d 111, 115 (2d Cir. 1987) (internal citations omitted). Temporal proximity can be sufficient to create an inference of retaliatory intent. *See*

*Donnelly v. Greenburgh Cent. Sch. Dist. No. 7*, 691 F.3d 134, 152 (2d Cir. 2012) (denying summary judgment based on the "very close" proximity – ten days – between plaintiff's return from FMLA leave and defendant's negative evaluation of his performance) (internal quotation marks and citations omitted); *Terry v. Cnty. of Cayuga*, No. 5:11-CV-1296, 2013 WL 5464395, *5 (N.D.N.Y. Sept. 30, 2013) (noting that plaintiff was terminated on the day she returned from FMLA leave, and finding that "[s]uch close temporal proximity generally gives rise to an inference of retaliation"). Notably, here Plaintiff is able to satisfy the fourth element *only* because of the temporal proximity between her leave and her termination of employment. Plaintiff was on leave from November 25, 2010, through February 21 or 22, 2011, at which time the Town ended her FMLA leave and informed her that she was terminated due to her poor performance and unprofessional conduct. There is no other evidence in the record giving rise to an inference of retaliatory intent.

Even assuming Plaintiff has made out a prima facie case of retaliation, she does not provide any evidence from which a reasonable factfinder could conclude that the Town's stated explanation for her termination was merely a pretext masking impermissible retaliatory motives. *See Pearson*, 785 F. Supp. 2d at 163-64. Defendant has come forward with a neutral reason for terminating her employment: her inability to meet the demands of the position of court clerk and, in particular, a significant backlog of scofflaw tickets, error report entries, and unaccounted funds creditable to offenders and payable to the State Comptroller's office. "An employer undoubtedly has the discretion to fire an at-will employee for mishandling and mismanaging funds or for poor performance, or both." *Kohls v. Beverly Entprs. Wisc., Inc.*, 259 F.3d 799, 805 (7th Cir. 2001) (citation omitted); *see also Bowman*, 2014 WL 2195857, at *9 (finding that the defendant met its burden to rebut the plaintiff's prima facie case of retaliation where the defendant "has

demonstrated that it terminated [the plaintiff] due to his unacceptable performance coupled with his insubordinate behavior").

Plaintiff has not provided any evidence suggesting that the performance issues identified by Defendant were merely pretext for discrimination. Plaintiff herself admitted that she was unable to keep up with the demands of her position. Defendant has produced evidence that Plaintiff's replacement was able to complete the tasks required of a full-time court clerk in three and a half days a week – tasks that Plaintiff was unable to complete working five days a week plus overtime. Plaintiff's only response is to assert that Judge Brenzel was aware of many of the issues stated as the basis for her termination for some time prior to her dismissal, and that the backlog had been building over time prior to her FMLA leave.[8] *See* Dkt. No. 29 at 13 ("most of the performance issues were due to the overwhelming amount of cases that the Court handles, which [Judge] Brenzel recognized and acknowledged, and which he never disciplined the Plaintiff for."). This response, however, does not contradict the statements by Judge Brenzel and others that the complete scope of Plaintiff's deficient performance did not come to light until she took her FMLA leave. "Here, . . . it is clear that the employer did not discover many of the deficiencies in [Plaintiff's] work – particularly with respect to [mismanagement of funds] – until after [Plaintiff] took leave. The fact that the leave permitted the employer to discover the problems can not logically be a bar to the employer's ability to fire the deficient employee." *Kohls*, 259 F.3d at 806. As such, Judge Brenzel's awareness of Plaintiff's performance and conduct issues prior to her FMLA leave does not give rise to an inference of discriminatory

---

[8] It is certainly possible that Plaintiff could have been disciplined less severely, or that the timing of her termination could have been handled differently. The Court's "role is not, however, to tell employers how to discipline employees; rather, it is to ensure that the process is not discriminatory." *Kohls*, 259 F.3d at 805.

intent. *See Breunlin v. Vill. of Oak Park*, No. 07 C 4627, 2008 WL 5100852, *15 (N.D. Ill. Dec. 2, 2008) ("Because [the plaintiff's supervisor] did not learn the full extent of the problems within [the plaintiff's program] until 2007 [the plaintiff's] performance evaluations from 2006 and 2007, which criticized [the plaintiff's] performance in earlier years, do not provide circumstantial evidence of a retaliatory motive."). Courts routinely award summary judgment to defendants in FMLA retaliation cases where the legitimate, non-discriminatory justification for an employee's termination are discovered as a result of the employee's leave. *See Carter v. UnumProvident Corp.*, No. 08-cv-32, 2009 WL 1034941 (E.D. Tenn. Apr. 17, 2009).

Further, temporal proximity, alone, is insufficient to create a triable issue of fact as to pretext. *Colombo v. East Irondequoit Cent. Sch.*, No. 07-CV-6270, 2010 WL 6004378, * 14 (W.D.N.Y. Dec. 17, 2010) (citing *Simpson v. New York State Dept. of Civil Servs.*, 166 Fed. Appx. 499, 502 (2d Cir. Jan. 9, 2006)). Thus, although Plaintiff can satisfy the low burden of establishing her prima facie case by relying on temporal proximity, temporal proximity alone is not enough for her to overcome the Defendant's legitimate, non-discriminatory reason for her termination. *See Breunlin*, 2008 WL 5100852, at *15 ("the timing of [the plaintiff's] termination does not permit an inference of retaliation, because the decision came on the heels of further discovery of" the plaintiff's mismanagement). Finally, Plaintiff has presented no evidence, such as comments made by Judge Brenzel or other representatives of the Town, indicating that the reason for her termination was her FMLA leave.[9]

_____

[9] Plaintiff raises a series of additional points in support of her argument that the Town's stated reasons for her dismissal were pretextual. Specifically, Plaintiff asserts that the unprofessional conduct or "attitude" issues raised by the Town were *de minimus* and stale. *See* Dkt. No. 29 at 14-18. Plaintiff apparently contends that since these are relatively weak reasons upon which to substantiate her dismissal, the Town's invocation of them demonstrates "that none of their reasons for her termination are worthy of belief." *Id.* at 17. The Court is unpersuaded by this argument. Plaintiff does not dispute that each of these incidents took place, but instead

As such, the Court concludes as a matter of law that Plaintiff cannot meet her burden to establish her FMLA retaliation under *McDonnell Douglas*. Accordingly, summary judgment is granted in Defendant's favor on Plaintiff's FMLA retaliation claim.

**2.      Claims Alleging Violations of the NYSHRL**

The traditional values of judicial economy, convenience, fairness, and comity weigh in favor of declining to exercise supplemental jurisdiction when all federal law claims are eliminated before trial. *See Kolari v. N.Y.-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006) (citing *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988)). Having granted summary judgment in Defendant's favor on all of the federal claims in this case, the Court declines to exercise supplemental jurisdiction over Plaintiff's remaining state law causes of action. *See id.* (citing 28 U.S.C. § 1367(c)(3)).

## IV.  CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Defendant's motion for summary judgment (Dkt. No. 27) is **GRANTED in part**; and the Court further

**ORDERS** that Defendants' motion for summary judgment on Plaintiff's FMLA claims is **GRANTED**; and the Court further

_____

contends that they are unimportant or took place years prior to her dismissal. The role of the Court is not to substitute its judgement for that of the employer. An employer may discharge an employee for a good reason, a bad reason, or no reason at all, so long as the employer was not motivated by impermissible considerations. *See Hlinko v. Virgin Atlantic Airways, Ltd.*, 205 F.3d 1323, (2d Cir. 1999) (citation omitted). Further, as Plaintiff concedes, the conduct issues are not the only reasons cited by the Town for Plaintiff's termination. Notably, Plaintiff does not contest the veracity or importance of the performance issues cited by the Town – namely, the backlog of tickets and mismanagement of funds – nor does Plaintiff's attack on the conduct issues undermine the legitimacy of the reasons for her dismissal.

**ORDERS** that Plaintiff's state law claims are **DISMISSED without prejudice** for lack of subject matter jurisdiction; and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in favor of Defendant and close this case; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated:  July 11, 2014
      Albany, New York

**Mae A. D'Agostino**
**U.S. District Judge**